IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA,
PHILADELPHIA DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for ADVANTA BANK CORP., | Case No.: |
|    Plaintiff, | |
| | JURY TRIAL DEMANDED |
| vs. | |
| DENNIS J. ALTER and WILLIAM A. ROSOFF, | |
|    Defendants, | |

## PLAINTIFF'S COMPLAINT

Plaintiff Federal Deposit Insurance Corporation as Receiver ("FDIC-R") for Advanta Bank Corp. ("Advanta" or "the Bank") files this Complaint against Defendants Dennis J. Alter ("Alter") and William A. Rosoff ("Rosoff") (collectively, "Defendants") for gross negligence and breach of fiduciary duty.

### I.     INTRODUCTION

1.     The FDIC-R brings this case in its capacity as Receiver for Advanta, a failed financial institution, against the two Advanta officers who had authority over the Bank's management and operations, as well as over all other officers of the Bank, including its president.  The position jointly held by Alter and Rosoff was formally entitled "the Office of the Chair."  The FDIC-R seeks to recover in excess of $219 million in damages that were directly and proximately caused by Defendants' breaches of fiduciary duties and gross

negligence in driving off the Bank's customer base by increasing credit card interest rates to unprecedented levels.

2.      Until 2007, Advanta was a profitable bank with high levels of capital.  In 2007, the Bank began experiencing a spike in customer delinquencies and defaults due to the recession.  To prop up the Holding Company's collapsing stock price and to maintain the Bank's dividends to its Holding Company[1], of which Alter was the largest shareholder, Alter and Rosoff implemented a plan to boost the Bank's short term earnings at the expense of the Bank's long term health.  Between January 1, 2008 and May 31, 2009, Alter and Rosoff implemented numerous, massive, and unprecedented "re-pricing" campaigns (raising annual percentage rates ("APRs")) on its credit card customers, which destroyed the Bank's customer base.

3.      Alter and Rosoff were grossly negligent and breached their fiduciary duties by failing to investigate or consider how their re-pricing campaigns would cost the Bank in terms of customer outrage, attrition, credit losses, and governmental sanctions.  Alter and Rosoff rejected the Bank's long historical experience that re-pricing beyond a small group of non-compliant customers would be counterproductive because it would drive off customers ("attrition") or cause them to default resulting in a credit loss to the Bank.  Alter and Rosoff also rejected the repeated warnings of Bank management that Alter and Rosoff's expanded and reformulated re-pricing would cause, and was causing, much higher attrition and credit losses.  Alter and Rosoff rejected the Bank's consultants' repeated warnings that the Bank was re-pricing many more accounts at much higher APR levels than its competitors, which was causing unusually high attrition.  Alter and Rosoff ignored the Bank's own internal

---

[1] Advanta was a wholly-owned subsidiary of Advanta Corp. (the "Holding Company").  Advanta Corp. and 18 of its subsidiaries filed for bankruptcy protection on November 8, 2009, under Chapter 11, in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

reports that showed statistically that attrition and credit losses were exploding because of the re-pricing. Finally, Alter and Rosoff completely ignored more than 35,000 customer complaints received by the Bank in 16 months (over 20,000 in the last quarter of 2008 alone) regarding the re-pricing campaign.

4.    Alter and Rosoff were also grossly negligent and breached their fiduciary duties by utilizing deceptive and misleading re-pricing "notices" that failed to disclose either the fact or the amount of the interest rate increases, failed to state a customer-specific reason for the re-pricing, and failed to give customers an adequate time to opt out. The Alter and Rosoff re-pricing notices resulted in an FDIC Restitution Order that cost the Bank $21 million.

5.    Alter and Rosoff breached their fiduciary duties to the Bank and were grossly negligent through implementation of their re-pricing campaigns from January 1, 2008 through May 31, 2009. The Alter and Rosoff re-pricing campaigns caused approximately 400,000 customers to close their credit card accounts and leave the Bank ("attrition"), which caused a net loss directly to the Bank of at least $59 million. In addition, the Alter and Rosoff re-pricing campaigns caused more than 40% of the Bank's remaining customers to default on their credit card accounts, which caused the Bank at least another $140 million in credit losses. No other credit card issuer re-priced their APRs to the degree that Advanta arbitrarily did; and, Advanta was the only major credit card issuer to go into insolvency proceedings during the financial crisis.

## II.    PARTIES

### A.    The Plaintiff

6.    The Federal Deposit Insurance Corporation ("FDIC") is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1831aa, with its principal place of business in Washington, D.C. 12 U.S.C. §§ 1811(a), 1813(z).  Among other duties, the FDIC, as receiver, is charged with the orderly liquidation of failed banks.  12 U.S.C. § 1821(c)(2)(A)(ii).

7.    On March 19, 2010, Advanta was closed by the Utah Department of Financial Institutions ("UDFI").  On that same date, the FDIC-R was appointed Receiver for Advanta pursuant to 12 U.S.C. §1821(c), and accepted its appointment as Receiver.  Pursuant to 12 U.S.C. §1821(d)(2)(A)(1), the FDIC-R succeeded to all rights, titles, powers and privileges of Advanta and its stockholders, accountholders, depositors, and creditors.

### B.    The Defendants

8.    Defendant Dennis J. Alter was a director, Chairman of the Board, and a member of the Office of the Chair (the highest executive office within the Bank) from 1991 until November 13, 2009.

9.    Defendant William A. Rosoff was a member of the Office of the Chair and Vice Chairman of the Bank's Board of Directors from January 16, 1996 until November 13, 2009.

## III.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. §1819 (b)(1) and (2) and 28 U.S.C. §§1331 and 1345.

11.     This Court has personal jurisdiction over Defendants, who at all relevant times were residents of, and conducted the business of the Bank, in the State of Pennsylvania.

12.     Venue in the Philadelphia Division of the Eastern District of Pennsylvania is proper under 28 U.S.C. §1391(b)(1) because Defendants Alter and Rosoff are residents of this division and district.

## IV.     FACTS

### A.     Brief History of Advanta.

13.     Advanta opened for business in December 1991.  Throughout its history, the Bank's management was headquartered in suburban Philadelphia.  After unsuccessful forays into the consumer credit card and sub-prime mortgage business, beginning in the early part of the last decade, Alter and Rosoff turned Advanta into a monoline bank focused solely on the issuance of small business credit cards and the securitization of the ensuing receivables.

14.     The Bank had no branches but conducted its operations on a national level. The Bank marketed depository services through a corporate website, provided online banking services, and communicated with customers via the telephone, wire, and mail systems.  The Bank was funded by securitizing its credit card receivables[2] and by internet and brokered deposits. The majority of the Bank's loan portfolio consisted of seller's interest (the portion of the securitization trust owned by the Bank), with the remainder consisting of Bank owned credit card receivables.

---

[2] Generally defined, the securitization of credit card receivables is the process by which these financial assets are transformed into securities.  Simply stated, a securitization involves the Bank selling its credit card receivables to a special purpose trust, which pays for the receivables by selling securities to investors.  The securities sold are backed by the cash flows generated from the credit cards.  The Bank retained a subordinate interest or share of the trust as further protection to the owners of the securities, which resulted in payments to the bank called "excess spread."

15.     As of year-end 2007, Advanta's customers' credit scores were among the best in the industry, the bank's earnings were strong, and the Bank had over $420 million in capital and $1.039 billion in liquid assets.  All of its securitization Class A notes were highly rated, investment grade securities, having received a received an "AAA" rating from Standard & Poor's and a "Aaa" rating from Moody's.  In other words, Advanta was well situated to survive an economic downturn.

16.     The last three FDIC Reports of Examination ("RoE") of the Bank before the 2008 Alter and Rosoff re-pricing campaigns rated the Bank as fundamentally sound overall and gave the Bank high marks for capital and earnings.

17.     As a result of the losses the Bank suffered due to the Alter and Rosoff re-pricing campaigns that are the subject of this Complaint, and based upon the recommendation and with the approval of Alter and Rosoff, the Bank allowed its securitizations to go into early amortization (the only card issuer to experience such a disaster), leading the Bank to cancel card charging privileges for all customers as of June 1, 2009.

**B.     Defendants' Control of the Bank.**

18.     Alter and Rosoff together comprised the Office of the Chair.  It was well-known throughout the Bank and the Holding Company that Alter and Rosoff had the final say on all important decisions on the management and operation of the Bank, and that Rosoff, on behalf of the Office of Chair, implemented its decisions through the Bank's senior management.  Everyone at the Bank, and even the top executives at the Holding Company, knew that they were executing the orders of Alter and Rosoff.  It was readily apparent to those persons in key positions at the Bank that one could not cross or disagree with Alter and

Rosoff.  Those who did either left the Bank or their jobs were eliminated.  Alter and Rosoff's control of the Bank and its operations was complete; and, one of the clearest manifestations of their control was in the implementation of the Bank's re-pricing strategy from January 1, 2008 through May 31, 2009.

      **C.**     **The ABCs of Re-pricing.**

19.     "Re-pricing" a credit card account merely means raising the annual percentage rate ("APR") that applies to the account.  Advanta used a standard re-pricing strategy for many years before 2007.  The essence of that strategy was to re-price customers who had engaged in negative behavior such as making late payments, going over their credit limit, or having a deteriorating credit rating.  This strategy usually resulted in re-pricing several thousand customers per month.  Re-pricing accounts generates income to the Bank in the abstract, but this benefit must be weighed against the negative effects of re-pricing: attrition of customers and balances and charge-offs caused by increasing a customer's minimum payment and debt load.  The existing wisdom in the industry and at the Bank was that re-pricing beyond a narrow band of customers was counterproductive for these reasons.  Alter and Rosoff knew this, but rejected it without evidence or logic.  Indeed even when the conventional wisdom was proved true by exploding attrition and credit losses caused by Alter and Rosoff's re-pricing programs, they continued to re-price unparalleled numbers of customers.

      **D.**     **Alter and Rosoff's Complete Lack of Diligence in Planning the Re-pricing Campaigns.**

20.     In 2007, Alter and Rosoff asked Opera Solutions, LLC ("Opera") to evaluate and propose changes to the Bank's operations.  One of the areas the Defendants discussed with Opera was re-pricing.  The Defendants thoroughly failed to investigate Opera's

expertise and the experience of its consultants.  In fact, Ajay Pillai and Kevin Walsh, the Opera consultants who were assigned to Advanta, and who later became Bank officers, had no experience with credit card re-pricing strategies.

21.     Advanta used a standard re-pricing model for many years before 2007, which re-priced customers who engaged in negative behavior.  The Bank employee historically responsible for the Bank's re-pricing program stated:

> The re-price model that Advanta used from 2000 to 2007 worked well.  We were re-pricing for risk—re-pricing unprofitable accounts.  We had a waterfall of exclusions including if the customer had made a complaint, a customer had opted out of a program, or the customer had been recently re-priced.  The customers in the waterfall of exclusions were the "don't touch" customers.  Opera went into the "don't touch" customers and said re-price them too.

22.     Alter and Rosoff promised Opera that the Bank would pay Opera 50% of any increased income from re-pricing proposed by Opera, but foolishly failed to include a component in the compensation formula to account for losses due to attrition and credit losses caused by the re-pricing.  Thus, because re-pricing automatically generates short term interest income, on which Opera would collect a 50% commission, it was no surprise that Opera proposed that the Bank more than double the number of customers it re-priced per month.  Alter and Rosoff did not inform either the Bank's board or the other members of the Bank's senior management who were reviewing the Opera proposal of the Opera compensation scheme or of the lack of experience of the Opera consultants proposing the scheme.

23.     Moreover, neither Alter, Rosoff, nor any member of the Bank's senior management team could explain how the Opera re-pricing plan worked; that is how it could be implemented without causing the attrition and credit losses that the Bank's and the

Industry's historical experience showed would flow from the broad re-pricing proposed by Opera.

24.     Alter and Rosoff directed the implementation of the Opera re-pricing program in September 2007, despite the near unanimous objections of the management of the Bank, two of whom were pushed out of their jobs because of their objections, and replaced with Pillai and Walsh, who also had no experience as Bank officers just as they had no experience in re-pricing credit cards.  After four months of using the Opera program, the increases in customer attrition—the very problem that management had warned Alter and Rosoff about— had come to pass.

25.     Nevertheless if Alter and Rosoff had merely continued to use the Opera recommendations, although such conduct would have been grossly negligent, it would have caused only a small portion of the harm to the Bank which followed.

26.     In 2008, instead of returning to the Bank's historical re-pricing practices, Alter and Rosoff stopped using the Opera recommendations and concocted their own re-pricing program that re-priced 10 times as many customers as the Opera program recommended be re-priced.  The Alter and Rosoff re-pricing program was driven by greed alone.  The Holding Company's stock price had plummeted in November 2007, and Alter and Rosoff's goal was to drive the price back up by increasing the Bank's short term income, continue to pay substantial dividends to the Holding Company, which flowed through to Alter, and maintain the $1 million plus per year compensation earned by Alter and Rosoff.

27.     Meanwhile Alter and Rosoff wreaked havoc on Advanta's recession-plagued small business customers by drastically raising over 60% of their interest rates.  Advanta's customers, which management called micro-businesses, the majority of whom had less than

$100,000 per year in net income and less than $200,000 in gross sales, were in no position to pay the doubled or tripled minimum payments imposed by the Alter and Rosoff 2008 re-pricing campaigns. Customer outrage, attrition, and credit losses ensued on a massive scale.

28. Throughout the re-pricing campaigns, Alter and Rosoff implemented their own pre-conceived ideas for re-pricing that were based on the simplistic idea that raising interest rates on customers would generate more income. Neither Alter nor Rosoff sought serious analysis to validate this idea nor sought quantification of the attrition and credit losses that re-pricing micro-businesses in a recession would cause to Advanta before approving the campaigns.

29. A prime example of Alter and Rosoff's arbitrary conduct is shown by Rosoff's order to Walsh to increase the pool of re-priced accounts to equal the number of delinquent Bank customers existing as of late 2007, many of whom were delinquent because of the Opera re-pricing. Walsh merely used a mathematical formula to increase the pool to the target directed by Rosoff. Thus, innocent customers were being chosen for re-pricing. There was no analysis or testing of this inexplicable multiplication of the re-pricing program to determine its effect on attrition or defaults. Walsh had absolutely no experience with calculating the number of accounts to be re-priced. Moreover, Walsh knew of no industry sources or support for making this change to the re-pricing model. The failure of Alter and Rosoff to conduct proper due diligence in the re-pricing campaigns was an extraordinary abdication of their fiduciary duties.

**E.    Alter and Rosoff Reject Management's Warnings.**

30. The Bank's President, Chief Marketing Officer ("CMO"), and Chief Credit Officer ("CCO"), all expressed objections to the Defendants' re-pricing strategy. Advanta's

President stated that "there's discomfort all around" the new re-pricing proposals.  The Bank's CCO stated that the new re-pricing proposals were like a "black box" because no one could explain how the Bank could re-price so many accounts without experiencing attrition that would cause a net loss from the re-pricing strategy.  The Risk Management Officer stated that the new re-pricing strategy was "disconnected from the reality of the world we live in," and the CCO said that the basis of the proposed new re-pricing strategy "is clearly short term profits versus the attrition risk."

31.     The CMO reported to Alter and Rosoff the "negative" response of Bank Management to the new re-pricing proposals and also provided them an analysis of the new re-pricing proposals prepared by an Advanta analyst.  This analysis includes the following in a June 21, 2007 email:

> I am worried that they seem to suggest that the majority of eligible accounts, including those currently excluded from re-pricing due to the projected unprofitability because of high attrition score, be re-priced. My impression is that in their view, most of these accounts are not sensitive to price change, and there is no difference of behavior if we increase by 4% or 8% in APR.  I am afraid we risk high attrition if we adopt their implementation.  I have doubt about their incremental profitability (17 [million] in the first year).  Their "reasoning" to derive this number is worrisome to me.  They proportionally calculate the incremental profitability for the portion (27 [thousand]) of eligible accounts (45 [thousand]), which are excluded in current campaign, based on estimate of re-priced group ([8,800]).

32.     In response to this email the CMO sent an email to the analyst and the entire senior management team of the Bank, with the exception of Alter and Rosoff, including the president, the CFO of the Holding Company, the CFO of the Bank, the CCO, the Risk Management Officer, and the employee administering the existing re-pricing programs stating: "thank you very much.  This is very helpful.  We have been having discussions with Kevin [Walsh] about this initiative and I think it is safe to say the group shares the concerns

laid out below."  The Bank's internal analysis, which expressed the views of the Bank's senior management, was that the Opera proposals did not make sense because there was no logic or evidence to explain how the Bank could re-price so many additional customers without the incremental interest income gains being offset by the attrition losses.

33.    Alter and Rosoff rejected the warnings from the Bank's management, and not only implemented the Opera proposals, but then implemented their own re-pricing plan which re-priced many times the number of customers Opera had proposed to re-price.  They also forced both the CMO and CCO to leave Advanta and replaced the CMO with Walsh and Pillai.

### F.    Alter and Rosoff Reject Outside Consultants' Warnings.

34.    On January 8, 2008, Argus Information & Advisory Services, LLC ("Argus"), one of the Bank's key outside consultants, who met at least quarterly with Rosoff, and whose quarterly reports were circulated among the Bank's senior management including the Office of the Chair, provided Alter and Rosoff with a report comparing Advanta with its competitors (what the report calls the "benchmark").  The Argus report stated that: "Advanta's higher pricing appeared to drive higher voluntary attrition than the benchmark" and among accounts with APRs over 24% (many of which were re-priced accounts), Advanta's attrition rate was 24.7%, which was more than four times higher than the benchmark.  Argus recommended that the Bank "refine retention strategies among these customers and consider lowering the APR among lower risk accounts to reduce attrition." Defendants rejected Argus' warnings and advice and in January 2008 re-priced more customers in one month than the Bank had re-priced in all of 2007.

35.      On August 21, 2008, Argus reported to Alter and Rosoff that the Bank was re-pricing far more customers than other credit card issuers and charging its customers higher APRs than other issuers.  Rather than being cautioned by this news, in September of 2008 Defendants directed the re-pricing of even more accounts than had been re-priced in any previous month throughout the Bank's existence.  The Bank's re-pricing during 2008 increased the number of the Bank's customers with APRs over 20% from 28% of the Bank's portfolio to a total of 52% of the Bank's portfolio.  Many of the Bank's customers had their APRs arbitrarily raised to over 30%; and, multiple re-pricings of the same customers were not uncommon, as the Defendants relaxed the Bank's previous restrictions on multiple re-pricing events during 2008 and early 2009.

36.      In February of 2009, Argus reported to Advanta on its re-pricing campaigns from October 2007 through September 2008.  Argus stated: "Advanta's retail pricing increased over the past year while the benchmark's retail pricing decreased. . . . Advanta re-priced 35% of its accounts in the 3rd Quarter 2008, with average price increases of 14.4%.  Benchmark re-priced 7% with average price increase of 11.7%."  Thus Alter and Rosoff were raising rates while the rest of the industry was lowering rates, and the Defendants were re-pricing a five times higher percentage of customers than their competitors.  Argus also found that the Bank had far higher interest and attrition rates than other credit card issuers.  The same Argus report revealed that the Bank suffered significantly higher delinquencies and charge-offs than other issuers.

37.      In April of 2009, Opera wrote a report to Alter and Rosoff stating that the re-pricing strategy was causing too much attrition, and suggested that the Bank should lower interest rates for its better customers.  Opera stated that 30% of the Bank's customers with an

APR of over 23% will be lost to attrition, which directly contradicted the 2007 Opera report stating that increasing interest rates would cause negligible attrition to the Bank's re-priced accounts.

### G. Alter and Rosoff Ignore the Bank's Internal Reporting and Hide Information from the Board.

38.     The Defendants were intimately aware of the disastrous results of the re-pricing strategy.  Throughout 2008 and the first quarter of 2009, Alter and Rosoff requested and received internal attrition reports reflecting the growing unprecedented attrition in the Bank's credit card portfolio.  These attrition reports revealed that the Bank lost 200,000 customers from March to October 2008, 405,000 customers from March 2008 through March 2009, and nearly $1 billion in credit card balances in calendar year 2008.

39.     In May 2008, Rosoff wrote a memorandum stating that the Bank was experiencing the same credit losses on accounts with FICO scores of 728 as Bank of America was experiencing on accounts with FICO scores of 685, which showed empirically that the credit worthiness of the Bank's customer base was declining.  Neither Alter nor Rosoff informed the Bank's Board of these facts.

40.     In July 2008, Advanta's CFO wrote Rosoff an email stating that Advanta had experienced $90 million in unexpected attrition losses and that: "It looks like a decent amount of this is re-price attrition above our expected levels."  Neither Alter nor Rosoff informed the Bank's Board of these facts.

41.     In December 2008, Pillai wrote a memo to Rosoff and others attempting to explain $800 million in incremental balance attrition in the Bank's credit card accounts between January 1, 2008 and October 31, 2008, as compared to the same period in 2007. According to Pillai's memo, the Bank's re-priced balances were over 60% of Advanta's book

and were attriting at an unprecedented rate.  Pillai further reported that at least $400 million

of the $800 million in lost balances were due to the re-priced accounts.

> ### H.    Alter and Rosoff Ignore Their Customers' Complaints.

42.    The Bank re-priced over 620,000 accounts under the Alter and Rosoff plan

during 2008, including over 90,000 accounts re-priced in January of that year alone, and over

120,000 accounts in September of that year.   At the same time, the Bank received over

35,000 customer complaints from October of 2007 through December of 2008.    The

customer complaints[3] reflected the grossly negligent manner in which Advanta treated its

cardholders and the resulting hostility of those cardholders.   Offended cardholders cancelled

their accounts or defaulted at unprecedented rates, exploding credit losses to the Bank as

already financially distressed cardholders either couldn't make the new higher minimum

payments or felt justified in not paying.  For example, a cardholder who had their rate raised

from 7.99% to 32.59% wrote: "we have consistently paid on time.  There has never been a

late payment, NOT ONCE. . . .   The APR was raised for NO REASON and with NO

NOTICE. . . .  Immediately close our account."  "You will likely end up with a large number

of complete defaults, because many people will never be able to make the minimum monthly

payments based on this rate."  A cardholder whose rate was raised from 7.99% to over 20%

said: "Now you have tripled my interest rate, made it impossible for me to make even the

minimum payments at this time. . . .   I hope you can't sleep at night for all you and your

company have done to the rest of us."  A cardholder whose rate changed from 10% to 35%

lamented: "Phone calls to your staff indicated to me that this was done because 'you could'

do it; there was no concrete reason behind it.  I have not been late or over my limit with you

---

[3] The statistics on customer complaints, appalling as they were, did not begin to reflect the depth of customer
outrage toward the Bank.  Oral complaints were not even listed in the statistics unless they were elevated to a
supervisor.

or anybody else. . . .   For these reasons, I suspect that there is widespread institutional practice of deception, graft and corruption at [the Bank]."

43.     Although Alter and Rosoff were aware of the rising level of customer complaints, they escalated rather than decreased the re-pricings and dismissed customer complaints.   They directed the creation of "talking points" for Bank representatives to respond to customer complaints that provided the customers no relief for their complaints and covered up the Bank's misconduct in a fog of disinformation.

44.     Alter and Rosoff also directed draconian collection practices that gave customers who had defaulted due to the re-pricings further reason not to pay Advanta or to move Advanta's bill to the back of the line of bills.   From the beginning to the very end, Alter and Rosoff completely ignored the customer's outrage, which was the core reason why the re-pricing campaigns were so disastrous for the Bank.   Yet outrage, which would lead to predictable losses of customer attrition and credit losses was a totally foreseeable result of their conduct:   they multiplied APRs and minimum payments on micro-businesses in a recession, used deceptive means to carry out the rate increases, disregarded customers' complaints, and used harsh collection methods on people they forced into default.

**I.     Alter and Rosoff's Deceptive Re-pricing Notices.**

45.     Throughout the period of the Alter and Rosoff re-pricing campaigns, they knew or were grossly negligent in not knowing, that the Bank's re-pricing notices were deceptive and misleading.   The notices failed to disclose the fact or amount of the APR increases, failed to disclose a customer specific reason for the APR increases, and failed to give the customers a reasonable period to opt out.

46.     Alter and Rosoff knew or were grossly negligent in not knowing that before 2007 prospective merger partners had questioned the propriety of the same re-pricing notices and how the Bank could get away with using such defective notices.

47.     In November 2008, after the Bank was notified that an FDIC enforcement action regarding the re-pricing was likely, the Bank's Risk Management Officer attempted to have Rosoff change the re-pricing notices to make full disclosure of the amount of the interest rate hikes, give a customer specific reason for the rate hikes, and give the customers an adequate opt out period.  He was told through a Rosoff emissary that he was acting like the Chief Credit Officer, who had been forced to resign in 2007, shortly after he criticized the proposed Opera re-pricing program. Although the notices were finally changed to make adequate disclosures, the only reason for the change was regulatory pressure from the FDIC rather than any sense of remorse over deceiving the customers by Alter and Rosoff.

**J.     The Devastating Consequences of the Defendants' Re-pricing Campaigns**

48.     The FDIC's December 1, 2008 Compliance Report of Examination described the Alter and Rosoff re-pricing campaigns as unfair and deceptive:

> The bank did not adequately notify the customer that the APR applicable to their account had been increased, did not disclose the amount of the increased APR, disclosed the customers' right to opt-out of the rate increase in a manner that effectively precluded customers from understanding their opt-out choice, and provided insufficient time to customers to exercise their right to opt out.
>
> ***
>
> In the second half of 2007, the bank re-priced a number of accounts using the bank's then-current proprietary credit model.  In late 2007 and 2008, the bank reformulated its proprietary credit model for re-pricing to include criteria that were neither defined as default events nor had previously been a basis for re-pricing. Under the reformulated credit model, the bank could increase an accountholder's APR where (1) the accountholder's account

balance was close to, but remained below the credit limit, or (2) the accountholder routinely made only the minimum payment required.   As a result, an accountholder who timely paid the minimum payment and/or kept the account near, but still under the account's credit limit, could be subject to an increase in the accountholder's APR.

\*\*\*

From June 2007 through November 2008, the bank engaged in over one million re-pricing actions on existing credit card accounts.  A large number of accountholders received substantial rate increases that raised APR's of 7.99 percent and 14.99 percent to rates that, after multiple increases, went in some cases as high as 37.18 percent on their outstanding balances.  These increases in turn caused a substantial increase in the minimum amount due each month.  The bank notified accountholders of the APR increases in a variety of notices including some that enclosed bank convenience checks or Mastercard inserts providing discounts on items such as hotel accommodations or express shipping.   Some customer complaints assert that because the customers mistook the notices for junk mail and discarded them, the customers became aware that the bank had increased their APR only after receipt of a subsequent billing statement, and by that time the 15-day period provided by the bank to opt-out of the rate increase had expired.

\*\*\*

The result of the bank's practices was a substantial increase in the APR applicable to customers' credit card accounts and a substantial increase in the minimum amount due each month on the customer's credit card account, affecting the customers' ability to keep the accounts in good standing and to pay other expenses.  The bank's practices resulted in substantial injury by causing monetary or economic harm to a substantial number of customers.

49.     On June 24, 2009, the Bank, with the approval of Alter and Rosoff,  as well as

counsel, entered into a stipulation and consent to the issuance of an order to cease and desist,

an order for restitution, and an order to pay $21 million in restitution to Bank customers of

the amount of increased interest accrued on re-priced customers' credit card accounts from

June 2007 throughout December 2008.  The FDIC issued the restitution order on June 30,

2008.  The order directly resulted from the gross negligence and breach of fiduciary duties of Alter and Rosoff in connection with the re-pricing campaigns.

50.     The Bank suffered massive losses due to Alter and Rosoff's re-pricing campaigns.   Such losses were primarily manifested by excessive account attrition and excessive credit losses.   From January 1, 2008 to June 30, 2009, Advanta lost a net of 472,000 accounts; over 40% of its existing customers.   Substantially more than half of those accounts were lost due to the Alter and Rosoff re-pricing campaigns and the ensuing customer outrage.   Additionally, the Bank lost customer balances of non-attriting customers, who did not surrender their cards, but merely used the cards less as result of the APR increases.   The FDIC estimates that the damages to the Bank from attrition of customers and balances to be in excess of $79 million.

51.     Additionally, the Bank experienced a significant increase in net credit losses when customers stopped paying because of Alter and Rosoff's re-pricings.   The FDIC's March 31, 2009 Report of Examination described the mechanism by which the Alter and Rosoff re-pricing campaigns caused credit losses to the Bank: "The targeted re-pricing of customer finance charge rates was done throughout 2008.   Re-pricing increases were especially aggressive in September and October.   The time between successive re-pricings was shortened from six to three months as well, meaning that many customers could have had their accounts re-priced four times within a year. . . .   The effect of these price changes was much higher minimum payments for revolving customers already struggling to make their minimum payment. . . .   The effect of rapidly increasing finance charge rates on minimum payments contributed to the acceleration of charge-offs in mid to late 2008 and early 2009."

52.     The Bank's net credit losses in 2008 and 2009 were double or triple those experienced by its competitors, and these adverse trends severely worsened beginning in early 2008 because of negative ramifications from the Alter and Rosoff re-pricing campaigns.  The Bank experienced over $471 million in credit losses during 2008 and 2009, at least 40% of which are attributable to the Alter and Rosoff re-pricing campaigns, resulting in damages to the Bank in excess of $140 million.

## V.     CLAIMS FOR RELIEF

## <u>COUNT ONE</u>

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(K)

53.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 - 56 of this Complaint as if fully set forth herein.

54.     Section 1821(k) of FIRREA holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their gross negligence, as defined by state law.  Gross negligence is the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.

55.     Defendants owed the Bank the obligations to act in good faith, with the reasonable care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that the Defendants reasonably believed to be in the best interest of the Bank.  Defendants were grossly negligent and failed to observe even slight care concerning the re-pricing campaigns, and exhibited carelessness and/or recklessness to a degree that demonstrated utter indifference to the consequences that may result.  Defendants' gross negligence was the proximate cause of the damages sought by the FDIC-R in this case.

The acts and/or omissions, constituting gross negligence committed by the Defendants, whether acting in concert or singularly, include, without limitation, the following:

a.      Approved, recommended, implemented and continued for 16 months a re-pricing program that put the existence of the Bank at risk;

b.      Approved, recommended, implemented and continued a re-pricing program that sacrificed the good of the Bank for a short term earnings boost;

c.      Approved, recommended, implemented and continued a re-pricing program that destroyed the Bank's customer base.

d.      Allowed or approved the use by the Bank of deceptive and misleading re-pricing notices;

e.      Approved, recommended, and implemented over one million re-pricings on over 60% of the Bank's customers;

f.      Approved, recommended, and implemented rate increases that were so large or frequent that they were unconscionable and caused customers to attrite or default;

g.      Approved, recommended, and/or implemented "talking points" for Bank representatives to respond to customer complaints that provided the customers no relief for their complaints and covered up the Bank's misconduct in a fog of disinformation;

h.      Approved, recommended, and/or implemented draconian collection practices that gave customers who had defaulted due to the re-pricings

further reason not to pay or to move Advanta's bill to the back of the line;

i.      Failed to make reasonable inquiry to become informed if there was reasoning, logic, and evidence that the re-pricing campaigns would benefit or harm the Bank;

j.      Failed to determine or investigate how the re-pricing campaigns would cost the Bank in terms of customer outrage, attrition, credit losses or governmental sanctions;

k.      Failed to carefully analyze or research the most basic re-pricing factors such as attrition or credit losses and how re-pricing would effect micro-businesses in a recession;

l.      Ignored the Bank's and industry's historical experience that re-pricing beyond a small group of non-compliant customers would be counterproductive;

m.      Rejected the warnings and red flags of their management team and outside consultants;

n.      Rejected the warnings and red flags of their own internal reporting system;

o.      Callously rejected the more than 35,000 customers complaints;

p.      Concocted their own re-pricing program that re-priced ten times the number of customers that Opera recommended be re-priced;

q.      Wreaked havoc on Advanta's recession-plagued small business customers by drastically raising over 60% of their interest rates;

r.      Irrationally directed Walsh to increase the number of customers re-priced to equal the number of customers who were delinquent;

s.      Failed to seek advice from competent professionals, whether in the Bank or outside of the Bank, of the risks to the Bank in utilization of the arbitrary APR price architecture employed in the Bank's re-pricing strategy from January 1, 2008 through May 31, 2009;

t.      Approved, and continued to approve from January 1, 2008 through May 31, 2009, re-pricing campaigns in spite of ever-increasing and unprecedented delinquency rates and attrition in the Bank's credit card portfolio;

u.      Failed to seek approval from the Bank's Board of Directors for the re-pricing campaigns;

v.      Failed to explain the risks of the unprecedented re-pricing campaigns to the Board;

w.      Failed to report to the Board the warnings that they had received from management and outside consultants;

x.      Failed to disclose to the Board the Opera compensation system;

y.      Failed to disclose to the Board the lack of experience in credit card re-pricing of the Opera consultants who later became Bank employees;

z.      Failed to disclose to the Board the abandonment of the Opera re-pricing recommendations in favor of Alter and Rosoff's own re-pricing plan that re-priced more than ten times the number of customers that were re-priced under the Opera recommendations;

aa.     Failed to disclose to the Board the 35,000 customer complaints;

bb.     Failed to disclose to the Board the increased attrition and credit losses that resulted from the re-pricing campaigns;

cc.     Failed to disclose to the Board that the re-pricing notices failed to disclose the fact or amount of the APR increases, failed to state a customer specific reason why the customer's APR was being increased, and failed to give the customers a reasonable period to opt out of the APR increase;

dd.     Failed to disclose to the Board that the re-pricing notices were deceptive or misleading; and

ee.     Developed and implemented the re-pricing plan from January 1, 2008 to May 31, 2009 in an unsafe and unsound manner.

At no time during the 2008 re-pricing campaigns did Alter and Rosoff rely on the advice of Opera, Walsh or Pillai, but as discussed above, they quickly abandoned the 2007 recommendations of Opera, Walsh and Pillai, and created their own 2008 re-pricing program and merely used Walsh and/or Pillai to perform mathematical calculations to achieve the results (re-pricing large numbers of customers) that Alter and Rosoff wanted and directed. Alter and Rosoff did not select Opera, Walsh or Pillai with due care and ignored their lack of experience in credit card re-pricing, and had no reasonable basis to believe that the recommendations of Opera, Walsh or Pillai were sound.   Indeed Advanta's senior management and outside consultants told Alter and Rosoff that the re-pricing campaigns would not work and were not working.  Most importantly Alter and Rosoff continued the re-pricing campaigns long after the disastrous results of those campaigns were obvious.

56.     Defendants' acts and/or omissions, constituting gross negligence, proximately caused at least $219 million in damages to the Bank.

## COUNT TWO

**BREACH OF FIDUCIARY DUTY**

57.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in paragraph 1 - 60 of this Complaint as if fully set forth herein.

58.     Defendants owed fiduciary duties to the Bank, including but without limitation, duties of loyalty, care and trust.  The duty of loyalty required Defendants to act in good faith and in the best interest of the Bank.  The duty of care required Defendants to exercise ordinary care, skill, and diligence in a manner that an ordinarily prudent businessman would give his own concerns under similar circumstances.  Defendants were required to act in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in manner the director or officer reasonably believes to be in the best interest of the Bank.

59.     Defendants breached these duties by, among other things, acting in bad faith, failing to act in good faith, failing to act in the best interest of the Bank, failing to exercise the ordinary care, skill, and diligence that an ordinarily prudent person in a like position would exercise under similar circumstances, sacrificing corporate interests, hindering corporate objectives, and causing massive losses to the Bank, leading to its destruction.  In addition, Defendants breached their fiduciary duties by, among other things, the following:

a.      Approved, recommended, implemented and continued for 16 months a re-pricing program that put the existence of the Bank at risk;

b.      Approved, recommended, implemented and continued a re-pricing program that sacrificed the good of the Bank for a short term earnings boost;

c.      Approved, recommended, implemented and continued a re-pricing program that destroyed the Bank's customer base;

d.      Allowed or approved the use by the Bank of deceptive and misleading re-pricing notices;

e.      Approved, recommended, and implemented over one million re-pricings on over 60% of the Bank's customers;

f.      Approved, recommended, and implemented rate increases that were so large or frequent that they were unconscionable and caused customers to attrite or default;

g.      Approved, recommended, and/or implemented "talking points" for Bank representatives to respond to customer complaints that provided the customers no relief for their complaints and covered up the Bank's misconduct in a fog of disinformation;

h.      Approved, recommended, and/or implemented draconian collection practices that gave customers who had defaulted due to the re-pricings further reason not to pay or to move Advanta's bill to the back of the line;

i.      Failed to make reasonable inquiry to become informed if there was reasoning, logic and evidence that the re-pricing campaigns would benefit or harm the Bank;

j.      Failed to determine or investigate how the re-pricing campaigns would cost the Bank in terms of customer outrage, attrition, credit losses or governmental sanctions;

k.      Failed to carefully analyze or research the most basic re-pricing factors such as attrition or credit losses and how re-pricing would effect micro-businesses in a recession;

l.      Ignored the Bank's and industry's historical experience that re-pricing beyond a small group of non-compliant customers would be counterproductive;

m.      Rejected the warnings and red flags of their management team and outside consultants;

n.      Rejected the warnings and red flags of their own internal reporting system;

o.      Callously rejected the more than 35,000 customers complaints;

p.      Concocted their own re-pricing program that re-priced ten times the number of customers that Opera recommended be re-priced;

q.      Wreaked havoc on Advanta's recession-plagued small business customers by drastically raising over 60% of their interest rates;

r.      Irrationally directed Walsh to increase the number of customers re-priced to equal the number of customers who were delinquent;

s.      Failed to seek advice from competent professionals, whether in the Bank or outside of the Bank, of the risks to the Bank in utilization of

the arbitrary APR price architecture employed in the Bank's re-pricing strategy from January 1, 2008 through May 31, 2009;

t.      Approved, and continued to approve from January 1, 2008 through May 31, 2009, re-pricing campaigns in spite of ever-increasing and unprecedented delinquency rates and attrition in the Bank's credit card portfolio;

u.      Failed to seek approval from the Bank's Board of Directors for the re-pricing campaigns;

v.      Failed to explain the risks of the unprecedented re-pricing campaigns to the Board;

w.      Failed to report to the Board the warnings that they had received from management and outside consultants;

x.      Failed to disclose to the Board the Opera compensation system;

y.      Failed to disclose to the Board the lack of experience in credit card re-pricing of the Opera consultants who later became Bank employees;

z.      Failed to disclose to the Board the abandonment of the Opera re-pricing recommendations in favor of Alter and Rosoff's own re-pricing plan that re-priced more than ten times the number of customers that were re-priced under the Opera recommendations;

aa.     Failed to disclose to the Board the 35,000 customer complaints;

bb.     Failed to disclose to the Board the increased attrition and credit losses that resulted from the re-pricing campaigns;

cc.    Failed to disclose to the Board that the re-pricing notices failed to disclose the fact or amount of the APR increases, failed to state a customer specific reason why the customer's APR was being increased, and failed to give the customers a reasonable period to opt out of the APR increase;

dd.    Failed to disclose to the Board that the re-pricing notices were deceptive or misleading; and

ee.    Developed and implemented the re-pricing plan from January 1, 2008 to May 31, 2009 in an unsafe and unsound manner.

At no time during the 2008 re-pricing campaigns did Alter and Rosoff rely on the advice of Opera, Walsh or Pillai, but as discussed above, they quickly abandoned the 2007 recommendations of Opera, Walsh and Pillai, and created their own 2008 re-pricing program and merely used Walsh and/or Pillai to perform mathematical calculations to achieve the results (re-pricing large numbers of customers) that Alter and Rosoff wanted and directed. Alter and Rosoff did not select Opera, Walsh or Pillai with due care and ignored their lack of experience in credit card re-pricing, and had no reasonable basis to believe that the recommendations of Opera, Walsh or Pillai were sound. Indeed Advanta's senior management and outside consultants told Alter and Rosoff that the re-pricing campaigns would not work and were not working. Most importantly Alter and Rosoff continued the re-pricing campaigns long after the disastrous results of those campaigns were obvious.

60.    The Defendants' breaches of fiduciary duties proximately caused at least $219 million in damages to the Bank.

## VI.    JURY DEMAND

61.    The FDIC-R respectfully demands a trial by jury of all issues of fact.

## VI.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the FDIC-R prays that Defendants Dennis J. Alter and William A. Rosoff be cited to appear and answer herein and that, on final hearing, the FDIC-R be awarded the following relief against Defendants jointly and severally:

        a. Actual damages in the amount proved at trial;

        b. Prejudgment interest at the maximum rate allowed by law;

        c. Post-judgment interest at the maximum rate allowed by law;

        d. Cost of suit; and

        e. Any other relief, both general and special, at law or in equity, to which
            Plaintiff may show itself just entitled.

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ADVANTA BANK CORP.

BY: //S// Samuel C. Stretton_____

Samuel C. Stretton
Pennsylvania Bar No. 18491
s.stretton@verizon.net
301 South High Street
PO Box 3231
West Chester, Pennsylvania 19381
(610) 696-4243 Telephone
(610) 696-2919 Facsimile

MULLIN HOARD & BROWN, L.L.P.
David Mullin, *pro hac vice* pending
Texas State Bar No. 14651600
dmullin@mhba.com
Mark S. Logsdon, *pro hac vice* pending
Texas State Bar No. 00795486
mlogsdon@mhba.com
500 South Taylor Street
Suite 800
Amarillo, Texas 79101
Mailing Address:
P. O. Box 31656
Amarillo, Texas 79120-1656
(806) 372-5050 Telephone
(806) 372-5086 Facsimile

Attorneys for Federal Deposit Insurance Corporation as
Receiver for Advanta Bank Corp.